Genail M. Nemovi, Esq.
California Bar No. 236834
NEMOVI LAW GROUP, APC
2173 Salk Ave., Suite 250
Carlsbad, CA 92008
(760) 585-7077 Main
(760) 890-1377 Fax
ecfnotify@nemovilawgroup.com

Honorable Julia W. Brand
Chapter 13

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES

In re:

MARK ANTHONY CIRILLO,

           Debtor.

Case No.: 25-13281

Chapter 13

**JPMORGAN CHASE BANK, NATIONAL ASSOCIATION'S OBJECTION TO CONFIRMATION OF PLAN**

**SUBJECT PROPERTY:**
2640 Vineyard Ave.
Los Angeles, CA 90016

341 Meeting
Date: July 10, 2025
Time: 10:00 a.m.

**CONFIRMATION HEARING**
Date: July 16, 2025
Time: 10:00 a.m.

JPMorgan Chase Bank, National Association ("Chase"), is the holder of a Note secured by a Deed of Trust, which were executed by the Debtor, Mark Anthony Cirillo ("Debtor"), as to the real property that is the Debtor's principal residence located at 2640 Vineyard Ave, Los Angeles, CA 90016. For the reasons set forth herein, Chase, by and through its undersigned

counsel, respectfully objects to confirmation of the Debtor's current Chapter 13 Plan on the following grounds:

## I. STATEMENT OF FACTS

On or about December 6, 2007, the Debtor, executed a WaMu Equity Plus Agreement and Disclosure, dated December 5, 2007, with an initial credit limit of $75,000.00 (the "Note") in favor of Washington Mutual, a Federal Association ("WAMU"). The Note was and remains secured by a WaMu Equity Plus Deed of Trust ("Deed of Trust") encumbering the real property located at 2640 Vineyard Ave, Los Angeles, CA 90016 (the "Property"). The Deed of Trust was subsequently assigned to Chase. A copy of the Note, Deed of Trust, and Assignment of Deed of Trust are attached hereto as **Exhibits A, B**, and **C**, respectively.

On or about April 21, 2025, the Debtor filed a petition for relief under Chapter 13 and thereafter filed his Chapter 13 Plan on May 5, 2025. As of April 21, 2025, the total debt due and owing on the Note is in the amount of $70,386.41. The arrearage as of April 21, 2025, is in the amount of $6,972.67; consisting of the past due interest of $6,572.67 and foreclosure fees in the amount of $400.00. However, the Chapter 13 Plan does not provide for payment of the outstanding pre-petition arrears to Chase in the amount of $6,972.67. A copy of the payment history is attached hereto as **Exhibit D**.

The Debtor's Chapter 13 Plan fails to address payment of the full amount of the arrears. Accordingly, the Amended Chapter 13 should include the correct amount of pre-petition arrears due to Chase.

## II. <u>ARGUMENT</u>

The provisions of 11 U.S.C. §1325 set forth the requirements for the Court to confirm a Chapter 13 Plan. The burden is on the debtors to demonstrate that the plan meets the conditions for confirmation. *Warren v Fidelity & Causalty Co. of NY*, (9th Cir. BAP 1988) 89 B.R. 87, 93. Essential to confirmation is the provision for payment in full of the secured creditor's claim. *Penrod v AmeriCredit Fin Servs.*, (In re Penrod) (9th Cir. 2015) 802 F.3d 1084, 1086. The Plan in this circumstance cannot be confirmed unless the Debtor includes and can in fact provide for

how the Debtor intends to treat Chase's secured claim.

The cure of any default on a secured claim on which final payment is due after completion of the Plan is required pursuant to 11 U.S.C. 1322(b)(5). As noted in the Note, the loan is not due until December 9, 2037. The Debtor's Plan cannot be confirmed unless provision for the full arrears of $6,972.67 is provided.  Without such provision, the Plan fails to meet the criteria of 11 U.S.C.§1325 (a)(5)(B)(ii) and cannot be confirmed as proposed.

## CONCLUSION

Based upon the facts presented, the Debtor's Plan cannot be confirmed as proposed. It is respectfully requested that the Court deny confirmation and dismiss or convert the Debtor's Chapter 13 case absent an amended plan which incorporates the proper treatment of Chase's secured lien.

Dated: June 18, 2025                    **NEMOVI LAW GROUP, APC**


By: _/s/ Genail M . Nemvoi___
GENAIL M. NEMOVI
Attorney for Creditor

**JPMORGAN CHASE BANK, NATIONAL ASSOCIATION'S OBJECTION TO CONFIRMATION OF PLAN**

**EXHIBIT A**

**Washington Mutual**

**WaMu Equity Plus™**
**AGREEMENT AND DISCLOSURE**

This WaMu Equity Plus(TM) Agreement and Disclosure ("Agreement") governs your home equity line of credit account (the "Credit Line") issued by the Bank identified below and secured by the property at the address identified below. In this Agreement, we use the words "Borrower," "you" and "your" to mean each and all of the persons who sign this Agreement. The words "we," "us" and "our" mean the Bank or any successor or assign. The word "Card" means each credit card that can be used to obtain advances on the Credit Line, whether in the form of purchase transactions, cash advances or otherwise. A Card will be issued only if so indicated in Section I below. Our "business days" are Mondays through Fridays, but federal legal public holidays are excluded. You should read all of this Agreement, but for your convenience, we have set forth some of the rate, payment and fee information on the first two pages. You and we agree as follows:

## I. GENERAL INFORMATION:

Borrower(s):
MARK A CIRILLO

| Bank: WASHINGTON MUTUAL BANK | Date of Agreement: 12/05/2007 | Account Number: ██████████ |
|---|---|---|
| Credit Limit: $75,000.00 | Maturity Date: 12/09/2037 | Initial Draw Period: 120 Months |

Property Address:
2640 VINEYARD AVE LOS ANGELES, CA 90016-2928

**Effective Disbursement Date: 12/09/2007**
The date on and after which you may begin to receive credit advances ("advances") from your Credit Line. This will be a date we specify, which shall follow the expiration of any rescission period required by law, our acceptance of this Agreement, and your meeting of all conditions for the Credit Line.

**Card Access:** You ☒ will ☐ will not receive a Card to access your Credit Line. If you will not have Card access, the terms and conditions in this Agreement regarding the Card will not be applicable.

**Discounts:** The **ANNUAL PERCENTAGE RATE** used to calculate the periodic **FINANCE CHARGES** you pay may be discounted based on your other relationships with the Bank and on whether you authorize payments by our Auto Pay service. The available discounts shown in Table A below are explained further in Section VI 5(c). The specific discount amounts and discounted rates are shown in Tables B and C below.

### Table A - Discounts

| Type of Discount | No. of Accounts Required | Minimum Balance Required | Currently Eligible for Discount |
|---|---|---|---|
| Auto Pay Authorization | 1 | $0.00 | Yes |
| Account Relationships | 1 | $50,000.00 | No |
| First Mortgage Relationship | 1 | $0.00 | Yes |

**Payments:** Send payments to
WASHINGTON MUTUAL BANK
CONSUMER LENDING -- BR2CLFL
PO BOX 6868
LAKE WORTH, FL 33466
or, if a different address is stated in the Periodic Statement, send payments to that address.

## II. VARIABLE RATE ADVANCES:

**Variable Rate Index:** The Daily Periodic Rate and **ANNUAL PERCENTAGE RATE** on your Credit Line are subject to change daily based on changes in the "Variable Rate Index," which is the highest "Prime Rate" most recently published in the "Money Rates" table of *The Wall Street Journal.*

Variable Rate Margin: 0.850 % (Does not include any discounts shown in Tables A, B or C)

**Maximum Variable Rate:** Daily Periodic Rate 0.049315 % (**ANNUAL PERCENTAGE RATE** 18.000 %)
**Minimum Variable Rate:** Daily Periodic Rate 0.000000 % (**ANNUAL PERCENTAGE RATE** %)

**Minimum Payment:** For Variable Rate Advances, your minimum monthly payment ("Minimum Payment") during both the Draw Period and any Post Draw Period (defined in Section VI.4 below) will be equal to all accrued and unpaid **FINANCE CHARGES**, late fees and other fees and charges described below, plus any past due amounts and any outstanding balance of your Credit Line in excess of your Credit Limit.

**Special Promotional Rates:** ☐ If this box is checked, then the special Promotional Rates shown in Table B below will apply beginning on the Effective Disbursement Date and continuing until the following Promotional Rate Expiration Date: N/A

### Table B - Current Rates on Variable Rate Advances

| Number of Discounts | Discount Percentage | Daily Periodic Rate | ANNUAL PERCENTAGE RATE | Daily Periodic Rate (Promotional Rate) | ANNUAL PERCENTAGE RATE (Promotional Rate) |
|---|---|---|---|---|---|
| No Discounts | 0.000 % | 0.022877 % | 8.350 % | N/A % | N/A % |
| 1 Discount | 0.250 % | 0.022192 % | 8.100 % | N/A % | N/A % |
| 2 Discounts | 0.500 % | 0.021507 % | 7.850 % | N/A % | N/A % |

## III. FIXED RATE LOAN OPTION ("FRLO"):

**Fixed Rate Loan Option Index and Rates:** The FRLO is your option to obtain fixed rate loans ("Fixed Rate Loans") under your Credit Line. Except as otherwise specified below under "Promotional Rates," if you choose to exercise the Fixed Rate Loan Option, the Daily Periodic Rate and **ANNUAL PERCENTAGE RATE** will be determined based on the "FRLO Index", which is the highest "Prime Rate" most recently published in the "Money Rates" table of *The Wall Street Journal*, plus a "FRLO Margin" of 14.0 %.

**Promotional Rates:** We may, at our sole discretion and without prior notice, provide a Fixed Rate Loan at a discounted **ANNUAL PERCENTAGE RATE**, that is, an **ANNUAL PERCENTAGE RATE** that is lower than the sum of the FRLO Index plus the FRLO

3 3 3 6 6 (08/29/07) w8.4

Margin stated above. The Daily Periodic Rate will also be reduced. These are called "Promotional Rates." If we provide Promotional Rates, they will be shown in a confirmation form that we provide you. FRLO Promotional Rates will remain in effect for the term of the FRLO.

### Table C - Current Rates on Fixed Rate Loans

| Number of Discounts | Discount Percentage | Daily Periodic Rate | ANNUAL PERCENTAGE RATE | Daily Periodic Rate (Promotional Rate) | ANNUAL PERCENTAGE RATE (Promotional Rate) |
|---|---|---|---|---|---|
| No Discounts | 0.000 % | 0.049315 % | 18.000 % | 0.023836 % | 8.700 % |
| 1 Discount | 0.250 % | 0.048630 % | 17.750 % | 0.023151 % | 8.450 % |
| 2 Discounts | 0.500 % | 0.047945 % | 17.500 % | 0.022466 % | 8.200 % |

*Rates are examples based on a $50,000 FRLO with an Amortizing Minimum Payment and a Term of five (5) years.

Maximum FRLO Rate:  Daily Periodic Rate 0.049315 % (ANNUAL PERCENTAGE RATE 18.000 %)
Minimum FRLO Rate:  Daily Periodic Rate 0.008219 % (ANNUAL PERCENTAGE RATE 3.000 %)

**FRLO Confirmation:** ☐ If this box is checked, you have chosen to exercise your option to obtain a Fixed Rate Loan on the Effective Disbursement Date. (If you have chosen to obtain a second Fixed Rate Loan on the Effective Disbursement Date, you must complete a separate form that we will provide to you upon request.) The terms of your Fixed Rate Loan will be as follows:

| Type: | | FRLO Sub-Account No.: N/A | Amount: N/A |
|---|---|---|---|
| Transaction Fee:  There is no Fixed Rate Loan Option Fee for any Fixed Rate Loan obtained upon opening the Credit Line. | | Daily Periodic Rate: N/A | Term: N/A Months |
| Buydown Fee (FINANCE CHARGE):  N/A  (Equal to N/A  % of the Fixed Rate Loan Amount | | ANNUAL PERCENTAGE RATE: N/A | N/A % |

Minimum Payment
N/A

**Payment Method:**
☐ You have elected to make your Fixed Rate Loan payments by payment coupon or billing statement.  If you do not receive your payment coupon or billing statement before your first payment is due, please send your payment, including your FRLO sub-account number (if any), to:
WASHINGTON MUTUAL BANK
CONSUMER LENDING -- BR2CLFL
PO BOX 6868
LAKE WORTH, FL 33466
or you may make your payment at any Washington Mutual Financial Center.

☐ You have elected to make your Fixed Rate Loan payments by our Auto Pay service.  You will need to sign a separate Auto Pay Automatic Loan Payment Authorization Form.

**How to Get a Fixed Rate Loan After Closing:**  Call 1-888-800-8738 toll-free (for TDD, call 800-735-2922) or, if a different telephone number is stated in the Periodic Statement, call that telephone number.

### Table D - Fixed Rate Loan Terms

| Type of Minimum Payment | Fixed Rate Loan Dollar Amount | Maximum Permissible Term |
|---|---|---|
| Amortizing Minimum Payment | Up to $19,999.99 | Up to 120 months (10 years).  If the Term extends beyond the Maturity Date, the principal amount will not fully amortize, and the remaining principal will be due and payable in full on the Maturity Date. |
| Amortizing Minimum Payment | $20,000.00 or more | Up to 240 months ( 20  years).  If the Term extends beyond the Maturity Date, the principal amount will not fully amortize, and the remaining principal will be due and payable in full on the Maturity Date. |
| Interest Only Minimum Payment | Any amount | 3, 5, 7 or 10 years, but the term must conclude before the Maturity Date |

## IV. FEES AND CHARGES:

**FINANCE CHARGES** and Other Fees and Charges at Closing: You agree to pay the following **FINANCE CHARGES** and other fees and charges, which will be charged to your Credit Line on the Effective Disbursement Date unless paid to us on or before that date.  Periodic **FINANCE CHARGES** will begin to accrue immediately on these amounts if charged to your Credit Line.

**FINANCE CHARGES:**                                          Other Fees and Charges:

\* These items will be paid by the Bank and charged to your Credit Line

**Additional FINANCE CHARGES:**  You agree to pay the following additional **FINANCE CHARGES:**

**Cash Advance Fee.**  A cash advance fee **FINANCE CHARGE** of 2.00% of each cash advance obtained on the Card, or $2.00, whichever is greater.

**Fee for Small Variable Rate Advance.**  If, at our sole option, we elect to honor a request for a Variable Rate  Advance of less than $100.00, a transaction **FINANCE CHARGE** of 4.00% of the amount of the advance.  This **FINANCE CHARGE** will not be imposed for Card transactions.

**Fee for Lien Subordination.**  If, at our sole option, we agree to subordinate the lien of the Security Instrument, a transaction **FINANCE CHARGE** of  $50.00 - $250.00 .

**Wire Transfer Fee.**  A wire transfer **FINANCE CHARGE** of  $30.00  for each advance that you initiate by a wire transfer.

3 3 3 6 6 (08/29/07) w8.4

**Courier Service Fee.** A courier service FINANCE CHARGE of $30.00 for each transmittal of documents that you request which we send by a delivery service.

**Fixed Rate Loan Option Fee.** A transaction fee FINANCE CHARGE of $50.00 for each Fixed Rate Loan that you receive. The Fixed Rate Loan Option Fee will be waived for any Fixed Rate Loan received on the Effective Disbursement Date or for the first Fixed Rate Loan received subsequently.

**Buydown Fee.** If we offer you the option to pay a fee in exchange for a reduced **ANNUAL PERCENTAGE RATE** for a Fixed Rate Loan, a transaction fee FINANCE CHARGE of 4.000% of the amount of the Fixed Rate Loan will be charged in return for a reduction of 0.250% in the **ANNUAL PERCENTAGE RATE** of the Fixed Rate Loan. At our sole discretion, we reserve the right to charge you a lesser Buydown Fee and/or offer a greater reduction in the **ANNUAL PERCENTAGE RATE** at the time you obtain a Fixed Rate Loan.

**Additional Other Fees and Charges:** You agree to pay the following additional other fees and charges:

**Annual Fee.** An annual fee of $0.00 ("Annual Fee"). The Annual Fee will be charged on the first anniversary of the Effective Disbursement Date and on every anniversary thereafter during the Draw Period. The Annual Fee is nonrefundable and will be imposed regardless of the balance and status of the Credit Line.

**Late Fee and Collection Charges.** In addition to our other rights upon default, if we do not receive the Minimum Payment on the Variable Rate Advances or any Fixed Rate Loans within fifteen (15) days after the Payment Due Date shown on your Periodic Statement (or, if applicable, on any payment coupon that we provide you), you will be charged a late fee of the greater of $15.00 or 5.000 % of the Minimum Payment. Upon your default under this Agreement, you will pay all of our reasonable costs and collection charges, whether or not there is a lawsuit, including, without limit, attorneys' fees and legal expenses, including without limit, for bankruptcy or civil proceedings, our efforts to modify or vacate an automatic stay or injunction, appeals, and any anticipated post-judgment collection services, and whether or not such are incurred by our employees or third parties.

**Overlimit Fee.** An overlimit fee of $20.00 for each advance from the Credit Line that causes you to exceed your Credit Limit.

**Dishonored Payment Fee.** A fee of $20.00 if you make a payment on your Credit Line (including any payment on a Fixed Rate Loan) with a check, draft, or other item or transfer (including an Auto Pay service transfer) that is dishonored for any reason.

**Stop Payment Fee.** A fee of $20.00 when you request a stop payment on a Check (as defined in Section VI.6(a) below.) A stop payment shall be effective for six (6) months (or, if applicable, such longer period as provided by law) and must be delivered to us in the manner prescribed by law or by method acceptable to us in our sole discretion and in sufficient time for us to act. If a stop payment notice expires, you must renew it as set forth above and you will be assessed an additional stop payment fee. There is no right to stop payment on transactions by use of a Card or other means of access other than a Check.

**Cancellation Fee.**
If you cancel your Credit Line during the first 36 months (30 months in NC) following the Effective Disbursement Date, you will be charged a cancellation fee equal to .125% of the Credit Limit or $500.00, whichever is greater

**Foreign Currency Transactions.** If you use the Card to make a purchase or obtain an advance in a foreign currency (the "transaction currency"), it will be converted by Visa International or MasterCard International (depending on which Card we issue from time to time) into U.S. Dollars (the "billing currency"). The details for conversion are discussed below in Section VI.6. We do not determine the exchange rate that is used and we do not add or subtract any adjustment to the exchange rate.

**Reject Fee.** A reject fee of $20.00 if a Check or other advance request (other than for a Card transaction) is not honored for any reason.

**Copy and Research Fees.** A copy fee of $1.00 per item and research fees of $10.00 per hour will be assessed if you request copies of Checks or other research relating to your Credit Line.

**Release Fee.** A fee of $65.00 in connection with the release, discharge or reconveyance of the Security Instrument (as defined in Section VI.3 below).

**Other Institution Fees.** Fees imposed by other institutions if you use the Card to obtain cash advances through their ATMs.

## V.  STATE-SPECIFIC NOTICES:

For the State of: CALIFORNIA

**Due on Transfer.** The Security Instrument (as defined in Section VI.3 below) contains the following provisions relating to certain sales and transfers of the Property:
Subject to applicable law, the entire Debt shall become immediately due and payable in full upon sale or other transfer of the Property or any interest therein by Trustor by contract of sale or otherwise including, without limit, any further encumbrance of the Property.

**Governing Law.** This Agreement and your Credit Line will be governed by and interpreted in accordance with the laws of the United States of America and, to the extent that such laws are not applicable, with the internal laws of the State of Nevada (without giving effect to any choice of law rule that would cause the application of the laws of any other jurisdiction to the rights and duties of the parties). Interest shall be charged at rates allowed to any class of lender by the laws of the State of _____ Nevada _____.

## VI.  STANDARD TERMS AND CONDITIONS:

**1.  Promise to Pay.** You promise to pay to us, or our order, all advances from the Credit Line plus all FINANCE CHARGES, fees, charges, expenses and other amounts required by the terms of this Agreement. All amounts outstanding under the Credit Line that are covered by the Fixed Rate Loan Option described in Section VII below are sometimes referred to in this Agreement as "Fixed Rate Loans." All other amounts outstanding under the Credit Line are sometimes referred to in this Agreement as "Variable Rate Advances." Unless otherwise provided in this Agreement, any amounts charged to the Credit Line shall be treated as Variable Rate Advances. If there is more than one of you, each is jointly and severally liable under this Agreement. Each Borrower alone may cancel the Credit Line, receive advances from the Credit Line and, except as stated below, take all actions with respect to the Credit Line. If Section I above indicates that you will receive a Card to access your Credit Line, each of you requests that we issue each Borrower a Card.

Your use of the Card at Automated Teller Machines ("ATMs") is subject to our rules relating to ATM transactions.

**2.  Credit Limit.** This Agreement covers a revolving line of credit in the amount shown in Section I above (the "Credit Limit"). During the Draw Period described below, you may obtain advances from the Credit Line up to the Credit Limit, repay any portion of the amounts advanced and obtain additional advances up to the Credit Limit. If there is more than one of you, each of you alone has the right to borrow up to the full amount of the Credit Limit and each of you is liable for all advances made to any of you. You agree not to request or obtain an advance that will make the Credit Line balance exceed the Credit Limit. We may, at our option, make advances in excess of the Credit Limit. At our request, you will immediately repay the amount by which the balance of the Credit Line exceeds the Credit Limit.

**3.  Security Instrument.** To secure the performance of your obligations under this Agreement, one or more of you is giving us a deed of trust, deed to secure debt, mortgage or other security agreement (the "Security Instrument") on the real property located at the address specified in Section I above and other property described therein (the "Property"). If the title to the Property is held by a trust, references in this Agreement to "you" and "your" shall include, with respect to the Property and as applicable, a person who is signing the Security Instrument as a trustee of the trust. The Security Instrument secures all advances and other amounts owed under this Agreement as well as after-acquired property located on or attached to the Property. You agree to perform all of your obligations under the Security Instrument. Regardless of the terms of any other security instrument that you have with us, no personal or real property, other than the Property, secures your obligations under this Agreement.

You will perform on a timely basis all payment and other obligations under the terms of any other deed of trust, mortgage, deed to secure debt or other security agreements or leases on the Property, as well as under any note or other obligation the performance of which is secured by the same.

**4.  Draw Period and Post Draw Period; Payments.** You may obtain advances from the Credit Line for the number of years after the Effective Disbursement Date described in Section I above (the "Draw Period"). At our option, we may extend the Draw Period for up to two (2) additional periods that are each no longer than the initial Draw Period stated in Section I above. The period of time, if any, between the end of the Draw Period and the Maturity Date is the "Post Draw Period." If the Draw Period is for ten (10) years, the Post Draw Period will be for twenty (20) years. If the Draw Period is for twenty (20) years, the Post Draw Period will be ten (10) years. For example if the Draw Period is for thirty (30) years, there will not be a Post Draw Period. During the Post Draw Period, if any, you will no longer be able to obtain advances from the Credit Line.

Payments for both Variable Rate Advances and any Fixed Rate Loans are due monthly. The payment due date (the "Payment Due Date") may be different for Variable Rate Advances and Fixed Rate Loans, and each Fixed Rate Loan may have its own Payment Due Date. At our sole option, we may change the Payment Due Dates at any time, and we may establish one Payment Due Date each month for all payments due with respect to the Variable Rate Advances and each Fixed Rate Loan. The Payment Due Date will be stated in your periodic billing statement (the "Periodic Statement") or, if applicable, on any payment coupons that we provide you.

For Variable Rate Advances, your minimum monthly payment ("Minimum Payment") during both the Draw Period and any Post Draw Period will be equal to the amount specified in Section II above as the Minimum Payment. Paying the Minimum Payments will not repay the principal that is outstanding on the Credit Line. You will be required to pay the entire outstanding balance of the Variable Rate Advances (together with all accrued and unpaid FINANCE CHARGES relating to the Variable Rate Advances and all other related amounts that you owe under this Agreement) in a single payment on the Maturity Date. We are not obligated to refinance any amount due on the Maturity Date. Your payments for any Fixed Rate Loans are described in Section VII below. For both Variable Rate Advances and Fixed Rate Loans, the following shall apply to payments. Payments must be made in U.S. Dollars. When you pay by check, funds must be drawn on a U.S. office of the financial institution. All payments shall be mailed, postage prepaid, to the address that appears on your Periodic Statement (or, if applicable, on any payment coupons that we provide you) for receipt of payments. Any payments that are not received on a business day, or that are received after 5:00 p.m. (prevailing Pacific Time) on a business day, will be treated as having been received on the next following business day. We can accept and apply any late or partial payments, or payments marked "Payment in Full" or similar statement, or with a request to apply a payment in a particular manner, to amounts you owe as set forth in this Agreement without liability on our part and without losing any of our rights under this Agreement. You will not make payments from funds obtained from the Credit Line or any other line of credit from the Bank or any of its affiliates. Payments accepted by the Bank on your Credit Line may be subject to temporary holds on the availability of funds before the payment amount may be re-advanced.

Each month, you will be required to send us one payment for the Variable Rate Advances and an additional separate payment for each Fixed Rate Loan. At our sole option, we may change this process at any time and require you to send us a single payment for both the Variable Rate Advances and your Fixed Rate Loan(s). Each payment will first be applied to accrued and unpaid periodic FINANCE CHARGES, then to any principal due, then to other FINANCE CHARGES, then to other fees and charges, and then to the unpaid principal balance. If you make a payment but do not specify where it should be applied, we will apply the payment in our discretion to outstanding Fixed Rate Loan(s) and/or Variable Rate Advances.

**5.  Periodic FINANCE CHARGE; Daily Periodic Rate; ANNUAL PERCENTAGE RATE.** The date on which periodic FINANCE CHARGES begin to accrue will depend upon the type of advance you obtain from the Credit Line. Periodic FINANCE CHARGES will begin to accrue from the date that we initiate a wire transfer, the date that you request to advance from one of our Financial Centers, the effective date of a Card transaction, the effective date of your withdrawal of funds from an ATM, the date that a Check (as defined below) is processed by us, the date of any increase to the balance of the Variable Rate Advances in accordance with Section VI.11(c) or Section VII.3(b), or Section VII.4 below, the date that we prepare a check to fund a Fixed Rate Loan on the Effective Disbursement Date or, thereafter, on the effective date of the conversion of all or any portion of the Variable Rate Advances into a new Fixed Rate Loan and/or one or more existing Fixed Rate Loans into a new Fixed Rate Loan and, for any other types of advances, the date the advance is made. Periodic FINANCE CHARGES will continue to accrue until all amounts subject to the periodic FINANCE CHARGES are paid in full. There is no free ride period that would allow you to avoid paying a periodic FINANCE CHARGE on advances you obtain from the Credit Line.

During both the Draw Period and any Post Draw Period, the periodic FINANCE CHARGE on the Variable Rate Advances for each billing period is a function of the Daily Periodic Rate (as described below), the Average Daily Balance (as described below), and the number of days in the billing period, as follows:

(a)  The Daily Balance of your Variable Rate Advances for each day of the billing period will be all Variable Rate Advances due at the beginning of that day, plus all new Variable Rate Advances (including, without limitation, any increase to the balance of the Variable Rate Advances in accordance with Section VI.11(c) or Section VII.3(b), or Section VII.4 below), less all payments and credits relating to Variable Rate Advances received that day. Nothing in this Section VI.5 authorizes you to obtain advances from the Credit Line during the Post Draw Period.

(b)  The Average Daily Balance is the sum of the Daily Balances of all days in the billing period divided by the number of days in the billing period.

(c)  The ANNUAL PERCENTAGE RATE and Daily Periodic Rate may vary. Except as stated below, the ANNUAL PERCENTAGE RATE will be equal to the sum of the Variable Rate Index stated in Section II above plus the Variable Rate Margin stated in Section II above, and the Daily Periodic Rate will be equal to the ANNUAL PERCENTAGE RATE divided by 365 (366 in a leap year). The ANNUAL PERCENTAGE RATE will be reduced by the amount of any applicable discounts shown in Table B in Section II above. The total discount will be based on the number of discounts that are applicable depending on whether you qualify for a particular discount at the time the ANNUAL PERCENTAGE RATE is determined. You will be eligible for a discount for "Auto Pay" if you authorize automatic loan payments for Variable Rate Advances using our Auto Pay service from an account at the Bank that you designate. If you qualified for an Auto Pay discount, you will no longer qualify if you or we cancel the Auto Pay or if you change to an automatic debit arrangement involving an account at another financial institution. You may separately decide whether you wish to authorize Auto Pay for the Variable Rate Advances and for each Fixed Rate Loan. Your

3 3 3 6 6 (08/29/07) w8.4

decision whether or not to authorize our Auto Pay service will not affect the availability of the Variable Rate Advances or Fixed Rate Loans. You will be eligible for a discount for "Account Relationships" as indicated in Table A if you maintain at least the specified number of accounts and the dollar amount of deposit, credit and investment accounts with the Bank, or its affiliate, as defined by the Bank. If you qualified for an "Account Relationships" discount, you will no longer qualify if the combined balances of the accounts fall below the minimum required. Further, an account will no longer be considered for the combined balance calculation if it becomes 30 or more days past due, is closed, or if no Borrower continues to be on title for the account. You will be eligible for a discount for a "First Mortgage Relationship" as indicated in Table A if you have outstanding the specified loan account and balance with the Bank, as defined by the Bank. If you qualified for a "First Mortgage Relationship" discount, you will no longer qualify if the loan used to obtain the discount becomes 30 or more days past due, is paid off or otherwise closed, or if no Borrower continues to be a borrower of record for the loan. Any discount marked "Not Applicable" or with similar language in Table A will not be available to you. If you do not qualify for a discount initially, but subsequently do so, the discount (up to the maximum number and amount of discount stated in Table B above) will be put into effect as of a date that we select.

Except as otherwise provided in this Section VI.5(c), the ANNUAL PERCENTAGE RATE and Daily Periodic Rate will change, beginning on the day following the Effective Disbursement Date, on each day that the Variable Rate Index changes. The Daily Periodic Rate and corresponding ANNUAL PERCENTAGE RATE for Variable Rate Advances will never be more than the maximum rates, and will never be less than the minimum rates, shown in Section II above. Increases in the Daily Periodic Rate and ANNUAL PERCENTAGE RATE will increase your Minimum Payment, periodic FINANCE CHARGES, and your final payment due on the Maturity Date.

(d) If Section II above indicates that special promotional rates will apply, then the initial Daily Periodic Rate and corresponding ANNUAL PERCENTAGE RATE Index plus the Variable Rate Margin. These lower rates are called "Promotional Rates." The Daily Periodic Rate will be equal to the ANNUAL PERCENTAGE RATE divided by 365 (366 in a leap year). If you are provided with Promotional Rates, the ANNUAL PERCENTAGE RATE will be reduced by the amount of any applicable discount shown in Table B in Section II above. The total discount will be based on the number of discounts that are applicable depending on whether you qualify for a particular discount at the time the ANNUAL PERCENTAGE RATE is determined. A description of these discounts is found in Section VI.5(c). If you do not qualify for a discount initially, but subsequently do so, the discount (up to the maximum discount stated in Table B above) will be put into effect as of a date that we select. If you are provided with Promotional Rates, the Promotional Rates will remain in effect until the Promotional Rate Expiration Date stated in Section II above, on which date the higher Daily Periodic Rate and corresponding ANNUAL PERCENTAGE RATE determined in accordance with Section VI.5(c), (f) will apply.

(e) The current Daily Periodic Rates and corresponding ANNUAL PERCENTAGE RATES are specified in Table B in Section II above. These rates will depend on (i) whether you have qualified for one or more discounts, (ii) whether you are being provided with Promotional Rates, or (iii) whether you have both qualified for one or more discounts and are being provided with Promotional Rates.

(f) If you have qualified for one or more discounts in the ANNUAL PERCENTAGE RATE (including any Promotional Rate), but thereafter you no longer qualify, the discount(s) will be eliminated on the date that you fail to qualify. On that date, the ANNUAL PERCENTAGE RATE will increase by the amount of the discount(s) for which you no longer qualify, and the Daily Periodic Rate will increase to the new ANNUAL PERCENTAGE RATE divided by 365 (366 in a leap year). For example, if you initially qualified for two discounts, but later qualify for only one discount, the increase in the ANNUAL PERCENTAGE RATE will equal the amount by which "2 discounts" exceeds "1 discount" in Table B. However, the increased Daily Periodic Rate and ANNUAL PERCENTAGE RATE will not be greater than the maximum rates stated in Section II above. Increases in the Daily Periodic Rate and ANNUAL PERCENTAGE RATE will increase your Minimum Payment, periodic FINANCE CHARGES, and your final payment due on the Maturity Date.

(g) The "Variable Rate Index" is stated in Section II above. If the Variable Rate Index, or any substitute Variable Rate Index, is no longer available, we will choose a new Variable Rate Index. The new Variable Rate Index will have a historical movement substantially similar to that of the prior Variable Rate Index, and the Variable Rate Margin will be changed so that the new Variable Rate Index plus the Variable Rate Margin will result in an ANNUAL PERCENTAGE RATE that is substantially similar to the ANNUAL PERCENTAGE RATE in effect at the time the prior Variable Rate Index becomes unavailable (plus any increase in the ANNUAL PERCENTAGE RATE that results from any termination of any Promotional Rate and/or the discounts, as described in Section VI.5(d), (f)).

(h) The Daily Periodic Rate may change within a single billing period. If only one Daily Periodic Rate is in effect during

the billing period, the periodic FINANCE CHARGE for the billing period will be calculated by first multiplying the Average Daily Balance by the applicable Daily Periodic Rate, and then multiplying that amount by the number of days in the billing period. If more than one Daily Periodic Rate is in effect during a billing period, the periodic FINANCE CHARGE for the billing period will be calculated by: (i) calculating a periodic FINANCE CHARGE for each Daily Periodic Rate by first multiplying that Daily Periodic Rate by the Average Daily Balance, and by then multiplying that amount by the number of days that such Daily Periodic Rate is in effect during the billing period, and (ii) by then adding together the periodic FINANCE CHARGES that are so determined for each such Daily Periodic Rate.

The ANNUAL PERCENTAGE RATE for both the Variable Rate Advances and the Fixed Rate Loans do not include costs other than interest. The periodic FINANCE CHARGE and ANNUAL PERCENTAGE RATE for the Fixed Rate Loans are described in Section VII below.

**6. Variable Rate Advances.** Provided you are not in default and your right to obtain advances has not been terminated, suspended or cancelled, you may obtain Variable Rate Advances during the Draw Period on and after the Effective Disbursement Date. All advances, other than by Card transactions outside the United States (as described below), shall be in U.S. Currency. You may obtain Variable Rate Advances as follows:

(a) Writing a preprinted check ("Check") that we supply to you for use with your Credit Line. The signature of only one Borrower is required for each Check.

(b) Using the Card to effect purchases, obtain cash advances at authorized ATMs (using the separate Personal Identification Number ("PIN") that we will supply to each of you), obtain cash advances at other locations or otherwise obtain advances.

(c) Requesting an advance in person at any of our Financial Centers. You will need to provide acceptable identification to obtain an advance.

(d) A wire transfer of funds to an account that you designate. Wire transfers are subject to our rules governing wire transfer transactions.

You authorize us to make available additional means of obtaining advances. Those advances will also be subject to this Agreement.

In addition, the balance of the Variable Rate Advances may be increased in accordance with Section VI.11(c) or Section VII.3(b), or Section VII.4(c) below.

If you use the Card to make a purchase or obtain an advance in a foreign currency (the "transaction currency"), it will be converted by Visa International or MasterCard International (depending on which Card we issue from time to time) into U.S. Dollars (the "billing currency"). Visa International or MasterCard International, as applicable, will use the procedures set forth in its operating regulations or conversion procedures in effect at the time the transaction is processed. Currently, the Visa International operating regulations state that the exchange rate between the transaction currency and the billing currency is: (i) a rate selected by Visa from the range of rates available in wholesale currency markets for the applicable central processing date, which rate may vary from the rate Visa itself receives or (ii) the government-mandated rate in effect for the applicable central processing date, in each instance, plus or minus an adjustment determined by the card issuer. The exchange rate for the applicable central processing date may differ from the rate in effect on the transaction date or the posting date. Currently, the MasterCard International conversion procedures state that the exchange rate between the transaction currency and the billing currency is either a wholesale market rate or a government-mandated rate as of a date selected by MasterCard International, in each instance plus or minus an adjustment determined by the card issuer. The exchange rate used by MasterCard International may differ from the rate in effect on the transaction date or the posting date. Regardless of which Card is used, the exchange rate used may be the same as, greater than, or less than the rate that would be available through a financial institution in the country in which the purchase or advance occurred. We do not determine the exchange rate that is used and we do not add or subtract any adjustment to the exchange rate.

**7. Minimum Advances and Other Limitations.** Each Variable Rate Advance, other than a purchase transaction with a Card, must be not less than $100.00. We may, at our option, make Variable Rate Advances of less than $100.00. At our option, we may (but reserve the right not to) honor any requests for advances in the following circumstances:

(a) Your credit privileges have been cancelled, suspended or terminated.

(b) Your Credit Limit is currently exceeded or would be exceeded if we honored the advance requested.

(c) Your Check is post-dated (written and presented before the date on the item) or stale dated (presented more than six (6) months after the date of the item).

(d) Your Check bears a restriction or notation.

(e) Your Checks have been reported lost or stolen or, if advances requiring a PIN have been authorized, you have reported that your PIN has been compromised.

3 3 3 6 6 (08/29/07) w8.4

(f)  You are in material default of this Agreement or would be so if we honored the advance request.

(g)  We receive conflicting instructions or demands from any of you.

(h)  You have asked us to prepare a payoff demand statement setting forth the amounts required to satisfy your obligations under this Agreement.

You agree to hold us harmless from and indemnify us against any claim or loss the payee or any other endorser or depositing or collecting bank may assert regarding such restrictions, notations or post or stale dated items. You further agree to indemnify and hold us harmless for any claim or loss relating to honoring or refusing to honor any instructions or demands which we believe may be conflicting.

Our liability, if any, for wrongful dishonor of an advance request is limited to your actual damages, shall not include consequential damages and in no event will exceed the amount of the advance request.

Checks may be processed mechanically based on information encoded on the item. Checks not meeting our format and encoding specifications may not be honored. The signature on each Check should match the signature on file with us, however, we may not verify the signature if the item is processed mechanically. Subject to applicable law, we will only pay Checks that are presented to us by another financial institution. We do not "certify" Checks drawn on your Credit Line.

**8. Illegal Transactions.** You will not use any advance, the Card, a Check or other access device to engage in any Internet gambling or illegal transaction (including, without limitation, illegal gambling). We are not responsible for preventing you from doing so.

**9. Periodic Statement.** As required by law, we will send you a Periodic Statement showing all new transactions since the prior Periodic Statement closing date and other information relating to the Credit Line. The Periodic Statements may be sent on other than a calendar month basis. We reserve the right to change the Periodic Statement closing date. We may choose not to return Checks along with your Periodic Statement.

**10. Loss or Theft.** Notify us if any unauthorized use of your Credit Line has occurred or may occur as a result of loss or theft of one or more of your Checks, Cards or other access device or if you believe someone else knows your PIN. The best way to notify us is by calling us. Call us at 800-556-5678  (for TDD, call 800-735-2922) or, if a different telephone number is stated in the Periodic Statement, call that number. You may also write us at the address stated in Section VI.16 below. You agree to reasonably assist us in determining the facts and circumstances relating to any unauthorized use of your Credit Line.

**11. Termination and Acceleration; Suspension of Advances and Reduction of Credit Limit; Other Remedies.**

(a)  We may terminate your Credit Line and require you to pay us the entire outstanding balance of the Credit Line (including the outstanding balance of any Fixed Rate Loans), together with all other fees, charges and amounts owing under this Agreement or the Security Instrument, in one payment, if any of the following happen:

(i)  You commit fraud or make a material misrepresentation at any time in connection with the Credit Line. This can include, for example, a false statement about your income, assets, liabilities or any other aspect of your financial condition.

(ii)  You do not meet any of the repayment terms of this Agreement.

(iii)  Your action or inaction adversely affects the Property or our rights in the Property. This can include, for example, failure to maintain required insurance or pay taxes on the Property, waste or destructive use of the Property which impairs our security, death of the last Borrower, death of all but one Borrower which impairs our security, transfer of title or sale of the Property without our permission, permitting the creation of a senior lien on the Property, foreclosure by the holder of a prior lien on the Property or use of the Property for an illegal purpose that subjects the Property to seizure.

If we terminate the Credit Line, no additional advances will be made and the entire outstanding balance of the Credit Line (including the outstanding balance of any Fixed Rate Loans) will be immediately due and payable without prior notice, except as may be required by law, and you agree to pay immediately such amount plus any other amounts due under this Agreement.

Failure to meet the repayment terms of any portion of the Credit Line, such as for Fixed Rate Loans or for Variable Rate Advances, will be considered failure to meet the repayment terms of the entire Credit Line, and this will give us the right to demand the immediate repayment of the entire outstanding balance of the Credit Line and to exercise any of our other rights under this Agreement. Likewise, payment of only a portion of the amount required under the repayment terms of this Agreement will not satisfy your repayment obligations for the entire Agreement. If a partial payment is made, we reserve the right to accept the payment and apply it to the outstanding balance of the Credit Line in accordance with Section VI. 4 without waiving our right to demand immediate payment of the entire outstanding balance of the Credit Line or to exercise any of our other rights under this Agreement.

(b)  In addition to any other rights we may have, we can suspend additional advances (including any Fixed Rate Loans) or reduce your Credit Limit during any period in which any of the following are in effect:

(i)  The value of the Property declines significantly below the value as determined by us at the time you applied for your Credit Line. This includes, for example, a decline such that the difference between the Credit Limit and the available equity is reduced by fifty percent (50.00%) and may include a smaller decline depending on individual circumstances.

(ii)  We reasonably believe that you will be unable to fulfill your payment obligations under this Agreement due to a material adverse change in your financial circumstances.

(iii)  You are in default of a material obligation of this Agreement. We consider all of your obligations to be material. Categories of material obligations include, for example, the events described above permitting us to terminate, obligations and limitations relating to your receipt of advances, obligations concerning maintenance or use of the Property, obligations to perform the terms of the Security Instrument or any other deed of trust, mortgage, deed to secure debt or other security agreement or lease on the Property (and to perform on any notes or other obligations secured by the same), obligations to notify us and to provide documents and information to us (such as updated financial information), and obligations to comply with applicable law (such as zoning restrictions).

(iv)  We are precluded by government action from imposing the **ANNUAL PERCENTAGE RATE** provided for under this Agreement.

(v)  The priority of our security interest in the Property is adversely affected by government action to the extent that the value of the security interest is less than 120.00% of the Credit Limit.

(vi)  We have been notified by a government authority that continued advances may constitute an unsafe and unsound business practice.

(vii)  If the maximum **ANNUAL PERCENTAGE RATE** stated in Section II above has been reached.

Regardless of any action that we take, all other terms of this Agreement will remain in effect and be binding upon you.

(c)  If, at any time, we have the right to terminate your Credit Line under Section VI.11(a) above, we may, at our sole option and without prior notice to you, then or thereafter convert any or all of your Fixed Rate Loans (including both the unpaid principal balance of the Fixed Rate Loans plus all accrued and unpaid **FINANCE CHARGES**) to the balance of your Variable Rate Advances, which will then accrue **FINANCE CHARGES** in accordance with Section VI.5 above and be subject to all other provisions of this Agreement relating to Variable Rate Advances. No exercise of this right to convert and nothing in this Section VI.11(c) shall constitute an election of remedies or a waiver of any of our rights under the remaining provisions of this Section VI.11, the remainder of this Agreement, the Security Instrument or at law or in equity.

(d)  Any Borrower may cancel the Credit Line or suspend the right to obtain advances by sending a written notice of cancellation or suspension to the address stated in Section VI.16 below. The notice must identify the account number of the Credit Line and be signed by at least one Borrower. The notice will be effective when it has been received and accepted by us. If the right to obtain advances is suspended at the request of a Borrower, advances will be reinstated only following our receipt and approval of a written request for reinstatement that has been signed by each of you.

(e)  If the Credit Line is cancelled, suspended or terminated, you agree not to attempt to write or deliver any Checks, use a Card or any other access device or otherwise obtain advances. You will return all Cards and unused Checks to us. You remain liable for any use of Checks, Cards or other access devices and any advances taken even after any cancellation by you or us, termination or suspension. If your Credit Line is cancelled or terminated, subject to applicable law, we may delay the cancellation or release of the Security Instrument for a reasonable period of time to enable us to post to your Credit Line any advances that you have received.

Our rights under this Agreement shall be in addition to any other rights we may have under the Security Instrument or at law or in equity.

**12. Delay in Enforcement; Corrections.** To the extent permitted by law, we may delay or waive the enforcement of any of our rights under this Agreement without losing that right or any other right and if we delay or waive any of our rights, we may enforce that right at any time in the future without advance notice. We may correct any inaccuracies that we find with respect to the Credit Line or any Periodic Statements.

**13. Presentment.** You waive any statutes of limitations, and any legal requirements of presentment, demand, protest, notice of dishonor and notice of protest of this Agreement.

**14. Credit Information.** You will provide us with a current financial statement, a new credit application, or both, at any time upon our request. We may obtain credit reports on you at any time for the purpose of reviewing or collecting your Credit Line. You authorize us to release information to others (such as credit bureaus, merchants, other financial institutions and any of our affiliate companies) about our transactions or experiences with you. **WE MAY REPORT INFORMATION ABOUT YOUR ACCOUNT TO CREDIT BUREAUS. LATE PAYMENTS, MISSED PAYMENTS, OR OTHER DEFAULTS ON YOUR ACCOUNT MAY BE REFLECTED IN YOUR CREDIT REPORT.**

**15. Transfer and Assignment.** Without prior notice to or approval from you, we reserve the right to sell or transfer this Agreement, the Credit Line and our obligations under this Agreement to any other person. Your rights under this Agreement belong to you only and may not be transferred, assumed or assigned. Your obligations, however, are binding upon your heirs and legal representatives.

**16. Notices.** Except as otherwise provided in this Agreement, notices must be in writing. Notice to any of you shall be deemed notice to all of you. Notices shall be deemed given when deposited in the U.S. Mail, postage prepaid first class mail, or when delivered in person, or sent by registered or certified mail, or by nationally recognized overnight carrier. Notice to you shall be sent to your last known address in our records for the Credit Line. Notice to us must be sent to:
WASHINGTON MUTUAL BANK
CONSUMER LENDING -- BR2CLFL
PO BOX 6868
LAKE WORTH, FL 33466
or, if a different address is stated in the Periodic Statement, to that address. Any party may change its address for receipt of notices by giving notice of the same, as set forth herein, to the other parties. You agree to notify us immediately if you change your name, address or employment or if any of you dies, is declared incompetent or is the subject of a bankruptcy or insolvency proceeding.

**17. Tax Consequences.** You should consult your own tax advisor regarding the tax deductibility of interest and charges under this Agreement.

**18. Special Terms.** In our sole discretion, we may offer you special terms on Variable Rate Advances from time to time. The special terms may include, by way of example, reduced rates, reduced fees, and reduced payments. The special terms may be available for temporary periods of time and on a limited basis.

**19. Amendment.** In addition to other changes described in this Agreement, we may make changes to the terms of this Agreement if you agree to the change in writing at that time, if the change will unequivocally benefit you throughout the remainder of your Credit Line or if the change is insignificant.

**20. Interpretation.** The names given to sections or paragraphs in this Agreement are for convenience and shall not be used to interpret this Agreement. This Agreement, the Periodic Statements and, if applicable, any payment coupons that we provide you are the best evidence of your agreement with us. If any provision of this Agreement, the Periodic Statements or any such payment coupons is found not to be valid or enforceable, such invalidity or unenforceability shall not affect the validity or enforceability of the remainder of such provision or the remaining provisions of that document, which provisions shall continue to be binding, valid and enforceable.

## VII. FIXED RATE LOAN OPTION

**1. Introduction.** If indicated in Section III above, you have the option (the "Fixed Rate Loan Option") to obtain advances from your Credit Line in the form of Fixed Rate Loans as described in this Section. Except as stated below, the Fixed Rate Loans will be subject to a fixed Daily Periodic Rate and **ANNUAL PERCENTAGE RATE** and a fixed term.

**2. General Terms and Conditions for the Fixed Rate Loan Option.** The following shall apply to the Fixed Rate Loan Option:
(a) The Fixed Rate Loan Option may be exercised only during the Draw Period.
(b) You may exercise the Fixed Rate Loan Option to obtain up to two (2) Fixed Rate Loans on the Effective Disbursement Date which, in the aggregate, may be any amount up to the then available portion of the Credit Limit. Thereafter, you may only exercise the Fixed Rate Loan Option by converting all or any portion of (i) the outstanding Variable Rate Advances, and/or (ii) one (1) or more existing Fixed Rate Loans, into a new Fixed Rate Loan in accordance with our procedures. Following the Effective Disbursement Date, you may not obtain a Fixed Rate Loan by obtaining an advance of new funds from the Credit Line.
(c) Each Fixed Rate Loan may be for any amount, but the aggregate of all Fixed Rate Loans and outstanding Variable Rate Advances may not exceed your available Credit Limit.
(d) The portion of the Credit Limit that is available to you for Variable Rate Advances will be reduced by the amount of each Fixed Rate Loan. Any repayment of the principal amount of a Fixed Rate Loan during the Draw Period will restore the available Credit Limit by an equal amount.
(e) You may exercise a Fixed Rate Loan Option only if no defaults exist under the terms of this Agreement or the Security Instrument, your right to obtain advances has not been terminated, suspended or cancelled and you agree all documents required by us. You may not obtain more than two (2) Fixed Rate Loans in any one (1) calendar year period and may not have more than five (5) Fixed Rate Loans outstanding at any time. You may not have outstanding at any time more than one Fixed Rate Loan that provides for an "Interest Only Minimum Payment" as described in Section VII.3(b) below. Notwithstanding any other provisions of this Section VII.2, we may convert any or all of your Fixed Rate Loans to the balance of your Variable Rate Advances in accordance with Section VI.1.1(c) above.
(f) You will be required to pay a Fixed Rate Loan Option Fee in the amount stated in Section IV above for each Fixed Rate Loan that you receive, except as provided in Section IV above. You may pay this fee prior to the making of the Fixed Rate Loan or it will be added to the principal balance of the Fixed Rate Loan.
(g) Except as stated below, the **ANNUAL PERCENTAGE RATE** that will apply to each Fixed Rate Loan will be equal to the sum of the FRLO Index stated in Section III above that is in effect on the day you exercise the Fixed Rate Loan Option to obtain that Fixed Rate Loan plus the FRLO Margin stated in Section III above. The **ANNUAL PERCENTAGE RATE** will be reduced by the amount of any applicable discounts shown in Table C in Section III above. The total discount will be based on the number of discounts that are applicable depending on whether you qualify for a particular discount at the time the **ANNUAL PERCENTAGE RATE** is determined. A description of these discounts is found in Section VI.5(c). If you do not qualify for a discount(s) when you exercise the Fixed Rate Loan Option, but you subsequently do so, the **ANNUAL PERCENTAGE RATE** for the Fixed Rate Loan will not be decreased.

If the FRLO Index, or any substitute FRLO Index, becomes unavailable, we will choose a new FRLO Index. The new FRLO Index will have a historical movement substantially similar to that of the prior FRLO Index, and the FRLO Margin will be changed so that the new FRLO Index plus the FRLO Margin will result in an **ANNUAL PERCENTAGE RATE** that is substantially similar to the **ANNUAL PERCENTAGE RATE** that would have been in effect at the time the prior FRLO Index becomes unavailable.

The Daily Periodic Rate for the Fixed Rate Loan will be equal to the **ANNUAL PERCENTAGE RATE** divided by 365 (366 in a leap year). The Daily Periodic Rate and corresponding **ANNUAL PERCENTAGE RATE** for the Fixed Rate Loan will not be greater than the maximum rates, and will not be less than the minimum rates, stated in Section III above. The periodic **FINANCE CHARGE** on the Fixed Rate Loan for each billing period will be a function of the outstanding principal balance of the Fixed Rate Loan each day of the billing period and the applicable Daily Periodic Rate. The outstanding principal balance of the Fixed Rate Loan for each day of the billing period is calculated by starting with the beginning principal balance that day and then subtracting any payments or credits relating to the Fixed Rate Loan received that day. The periodic **FINANCE CHARGE** that will apply to the Fixed Rate Loan for each billing period will be determined by first multiplying the applicable Daily Periodic Rate by the outstanding principal balance of the Fixed Rate Loan for each day of the billing period and then adding together the resulting amounts.

You will be deemed to exercise a Fixed Rate Loan Option when the FRLO Confirmation provisions in Section III above are completed and you sign this Agreement, when you sign any other required documentation at the time that you sign this Agreement, when you sign the required documentation at one of our Financial Centers, or when you call the toll-free telephone number described in Section III above and provide us with all required information.

(h) We may, at our sole discretion and without prior notice, provide a Fixed Rate Loan at a Daily Periodic Rate and corresponding **ANNUAL PERCENTAGE RATE** that will be lower than the sum of the FRLO Index plus the FRLO Margin as described in accordance with Section VII.2(g). These lower rates are called "Promotional Rates". The Daily Periodic Rate will be equal to the **ANNUAL PERCENTAGE RATE** divided by 365 (366 in a leap year). If you are provided with Promotional Rates, the **ANNUAL PERCENTAGE RATE** will be reduced by the amount of any applicable discounts shown in Table C in Section III above. The total discount will be based on the number of discounts that are applicable depending on whether you qualify for a particular discount at the time the **ANNUAL PERCENTAGE RATE** is determined. A description of these discounts is found in Section VI.5(c). If you do not qualify for a discount(s) when you exercise the Fixed Rate Loan Option, but you subsequently do so, the **ANNUAL PERCENTAGE RATE** for the Fixed Rate Loan will not be decreased. If we provide a Fixed Rate Loan at Promotional Rates, we are not obligated to offer Promotional Rates on any subsequent Fixed Rate Loans. The amount of the Promotional Rates may change from time to time.

In addition to any Promotional Rates and discounts shown in Table C in Section III above, we may, at our sole discretion and without prior notice, offer you the option to pay a fee ("Buydown Fee") to reduce the rate further on your Fixed Rate

Loan. If we offer and you accept this buydown option, the **ANNUAL PERCENTAGE RATE** that would otherwise be applicable to the Fixed Rate Loan will be reduced and the Daily Periodic Rate will be equal to the reduced **ANNUAL PERCENTAGE RATE** divided by 365 (366 in a leap year). The amount of the Buydown Fee that you must pay, and the amount of the reduction in the **ANNUAL PERCENTAGE RATE,** are stated in Section IV above. At our sole discretion, we reserve the right to charge you a lesser Buydown Fee and/or offer a greater reduction in the **ANNUAL PERCENTAGE RATE** at the time you obtain a Fixed Rate Loan, and this may vary from one Fixed Rate Loan to another. A separate Buydown Fee must be paid for each Fixed Rate Loan that is subject to the buydown option. You must pay the Buydown Fee prior to the making of the Fixed Rate Loan or it will be added to the principal balance of the Fixed Rate Loan. If you prepay the Fixed Rate Loan, none of the Buydown Fee will be returned to you or credited to your Fixed Rate Loan or Credit Line. If we offer you the buydown option for a Fixed Rate Loan, we are not obligated to offer the buydown option for any subsequent Fixed Rate Loans. The reduction in the **ANNUAL PERCENTAGE RATE** resulting from the buydown option will remain in place for the full term of the Fixed Rate Loan, but the **ANNUAL PERCENTAGE RATE** may be increased as otherwise provided in this Section VII.

(i) The current Daily Periodic Rates and corresponding **ANNUAL PERCENTAGE RATES** are specified in Table C in Section III above. These rates will depend on (i) whether you have qualified for one or more discounts, (ii) whether you are being provided with Promotional Rates, or (iii) whether you have both qualified for one or more discounts and are being provided with Promotional Rates.

(j) If you have qualified for one or more discounts in the **ANNUAL PERCENTAGE RATE,** but thereafter you no longer qualify, the discount(s) will be eliminated on the date that you fail to qualify. On that date, the **ANNUAL PERCENTAGE RATE** of each Fixed Rate Loan will increase by the amount of the discount(s) for which you no longer qualify, and the Daily Periodic Rate will increase to the new **ANNUAL PERCENTAGE RATE** divided by 365 (366 in a leap year). For example, if you initially qualified for two discounts, but later qualify for only one discount, the increase in the **ANNUAL PERCENTAGE RATE** will equal the amount by which "2 discounts" exceeds "1 discount" in Table C. However, the increased Daily Periodic Rate and **ANNUAL PERCENTAGE RATE** will not be greater than the maximum rates stated in Section III above.

**3. Choice of Terms and Minimum Payment for the Fixed Rate Loan Option.** You have the following choices regarding the term and Minimum Payment for a Fixed Rate Loan:

(a) *Amortizing Minimum Payment.* With this choice, you may determine the amortization term of each Fixed Rate Loan ("Term") at the time you exercise the Fixed Rate Loan Option. The Term shall be in increments of one (1) year. The maximum permissible Terms available for the Fixed Rate Loan are stated in Table D in Section III above and will depend upon the dollar amount of the Fixed Rate Loan. Your Minimum Payment for the Fixed Rate Loan is the amount sufficient to repay the original principal balance of the Fixed Rate Loan, together with periodic **FINANCE CHARGES** at the applicable **ANNUAL PERCENTAGE RATE,** in full in substantially equal monthly installments during the Term that you will select at the time you exercise the Fixed Rate Loan Option. The entire outstanding principal balance of the Fixed Rate Loan together with all accrued and unpaid **FINANCE CHARGES,** if not sooner paid, will be due and payable in full in a single payment on the earlier of the Credit Line Maturity Date or the last day of the scheduled Term. We are not obligated to refinance this amount.

(b) *Interest Only Minimum Payment.* With this choice, you must select one of the terms for the Fixed Rate Loan that is described in Table D in Section III above. You must make this selection at the time you exercise the Fixed Rate Loan Option. Your Minimum Payment will be equal to all of the unpaid periodic **FINANCE CHARGES** that have accrued on the outstanding principal balance of the Fixed Rate Loan at the applicable **ANNUAL PERCENTAGE RATE.** Your Minimum Payments will not repay any of the outstanding principal balance of the Fixed Rate Loan. At the conclusion of the term of the Fixed Rate Loan, the entire outstanding principal balance of the Fixed Rate Loan, together with all accrued and unpaid **FINANCE CHARGES** and all other fees and charges relating to the Fixed Rate Loan, automatically will be transferred to the balance of your Variable Rate Advances, which will then accrue **FINANCE CHARGES** in accordance with Section VI.5 above and be subject to all other provisions of this Agreement relating to Variable Rate Advances. If you choose to pay only the Minimum Payments, then (i) the payments on your Variable Rate Advances may increase substantially following the conclusion of the term of the Fixed Rate Loan, and (ii) the final payment due on the Maturity Date may increase substantially.

You must make your choices regarding a Fixed Rate Loan at the time you exercise the Fixed Rate Loan Option for the loan in accordance with our procedures. You may make a different choice for each Fixed Rate Loan that you obtain.

We will notify you of the amount of the Minimum Payment for the Fixed Rate Loan. If the Fixed Rate Loan has an Amortizing Minimum Payment, your first Minimum Payment may be for a period of less than one month and, if so, we may apply the excess amount of the payment to the outstanding principal balance of the Fixed Rate Loan, which may reduce the amount of your final scheduled payment on the Fixed Rate Loan. Your Minimum Payment on each Fixed Rate Loan is in addition to the Minimum Payments that you must pay on any other Fixed Rate Loans and on the Variable Rate Advances.

**4. Change in Minimum Payment Following Termination of Discount(s).** If you have qualified for one or more discounts in the **ANNUAL PERCENTAGE RATE,** but thereafter you no longer qualify, the discount(s) will be eliminated and the **ANNUAL PERCENTAGE RATE** and Daily Periodic Rate of each Fixed Rate Loan will increase in accordance with Section VII.2(j). Your Minimum Payment will also increase. Your new Minimum Payment will be determined in accordance with the applicable paragraphs of Section VII.3 above, with the exception that (a) the Minimum Payment will be calculated using the increased **ANNUAL PERCENTAGE RATE** and, (b) if the Fixed Rate Loan has an Amortizing Minimum Payment, the Minimum Payment will be based on the anticipated unpaid principal balance and remaining scheduled Term of the Fixed Rate Loan. For a Fixed Rate Loan with an Amortizing Minimum Payment, the periodic **FINANCE CHARGES,** the Minimum Payment, and any payment due on the earlier of the Credit Line Maturity Date or the last day of the Term will increase. For a Fixed Rate Loan with an Interest Only Minimum Payment, the periodic **FINANCE CHARGES,** the Minimum Payment, the balance transferred to your Variable Rate Advances at the conclusion of the Fixed Rate Loan, the amount of the Minimum Payments due on the Variable Rate Advances, and the final payment due on the Maturity Date will increase. We will notify you of the amount of the new Minimum Payment for the Fixed Rate Loan.

**5. Special Terms.** In our sole discretion, we may offer you special terms on Fixed Rate Loans from time to time. The special terms may include, by way of example, reduced rates, reduced fees, and reduced payments. The special terms may be available for temporary periods of time and on a limited basis.

**6. Conflicts.** In the event of any conflict or inconsistency between the provisions of this Section VII and the remaining provisions of this Agreement, the provisions of this Section VII shall prevail. Except as otherwise provided in this Section VII, all remaining provisions of this Agreement shall apply to the Fixed Rate Loans in accordance with their terms.

**VIII. BILLING RIGHTS**

**YOUR BILLINGS RIGHTS**
**KEEP THIS NOTICE FOR FUTURE USE**
This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

*Notify Us in Case of Errors or Questions About Your Bill.* If you think your bill is wrong, or if you need more information about a transaction on your bill, write us (on a separate sheet) at the address listed on your bill. Write to us as soon as possible. We must hear from you no later than sixty (60) days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:
* Your name and account number.
* The dollar amount of the suspected error.
* Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

If you have authorized us to pay your bill automatically from your deposit account, you can stop the payment on any amount you think is wrong. To stop the payment, your letter must reach us three (3) business days before the automatic payment is scheduled to occur.

*Your Rights and Our Responsibilities After We Receive Your Written Notice.* We must acknowledge your letter within thirty (30) days, unless we have corrected the error by then. Within ninety (90) days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question or report you as delinquent. We can continue to bill you for the amount you question, including **FINANCE CHARGES,** and we can apply any unpaid amount against your credit limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. If we find that we made a mistake on your bill, you will not have to pay any **FINANCE CHARGES** related to any questioned amount. If we did not make a mistake, you may have to pay any **FINANCE CHARGES** and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date on which it is due.

If you fail to pay the amount that we think you owe, we may

report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten (10) days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. And we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we do not follow these rules, we cannot collect the first $50.00 of the questioned amount, even if your bill was correct.

*Special Rule for Credit Card Purchases.* If you have a problem with the quality of property or services that you purchased with a credit card and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the property or the services. There are two limitations on this right:

(a) You must have made the purchase in your home state or, if not within your home state, within 100 miles of your current mailing address; and

(b) The purchase price must have been more than $50.00.

These limitations do not apply if we own or operate the merchant or if we mailed you the advertisement for the property or services.

## SIGNATURES

By signing below, you agree to the terms of this Agreement and you acknowledge that you have read and received a copy of this Agreement.

MARK A CIRILLO

Pay to the order of

Without Recourse
Washington Mutual Bank

Robin E. Tange, Vice President

# EXHIBIT B

▲                **This page is part of your document - DO NOT DISCARD**                ▲

  

**20072798692**   **Pages: 010**

███████████████████████████

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

Fee:  46.00
Tax:  0.00
Other: 0.00

**12/20/07 AT 08:00AM**

Total: 46.00

**Title Company**

# TITLE(S) :

_____

▲                ███████████████████                ▲

L E A D   S H E E T

**Assessor's Identification Number (AIN)**
**To be completed by Examiner OR Title Company in black ink.**       **Number of AIN's Shown**

▲   E442318      **THIS FORM IS NOT TO BE DUPLICATED**                ▲

Recording requested by and
when recorded return to:
WASHINGTON MUTUAL BANK
250 COMMERCE
2ND FLOOR
IRVINE, CA 92602
ATTN: SERVICELINK

ORIGINAL DEED                        12/20/07

**20072798692**

 **Washington Mutual**

**WaMu Equity Plus™**
**DEED OF TRUST**

Loan Number:

THIS DEED OF TRUST is between:
MARK A CIRILLO



whose address is:
                    2640 VINEYARD AVE  LOS ANGELES, CA 90016-2928
("Trustor");    CALIFORNIA RECONVEYANCE COMPANY        , a          CALIFORNIA
corporation, the address of which is:
                    9200 OAKDALE AVENUE CHATSWORTH, CA 91311
and its successors in trust and assigns ("Trustee"); and
WASHINGTON MUTUAL BANK, A FEDERAL ASSOCIATION, WHICH IS ORGANIZED AND
EXISTING UNDER THE LAWS OF THE UNITED STATES OF AMERICA AND WHOSE ADDRESS IS
2273 N GREEN VALLEY PARKWAY, SUITE #14, HENDERSON, NV  89014 ("BENEFICIARY") AND
ITS SUCCESSORS OR ASSIGNS.
    1.   **Granting Clause.** Trustor hereby grants, bargains, sells and conveys to Trustee in
trust, with power of sale, the real property in _____ LOS ANGELES _____ County, California,
described below and all interest in it Trustor ever gets:
LT: 14 SD: 4831 BK: 54 PG: 90, COUNTY OF LOS ANGELES, CA

ACCOMODATION ONLY THIS INSTRUMENT FILED FOR RECORD
BY TICOR TITLE COMPANY IS AN ACCOMMODATION
ONLY. IT HAS NOT BEEN EXAMINED AS TO ITS EXECUTION,
OR AS TO ITS EFFECTS UPON TITLE

**570018457**

Tax Parcel Number:_____ 5057-006-005 _____ together with all
insurance and condemnation proceeds related to all plumbing, lighting, air conditioning and
heating apparatus and equipment; and all fencing, blinds, drapes, floor coverings, built-in

4 3 6 0 (01/24/07) w8.2                                                Page 1 of 7

appliances and other fixtures at any time installed on or in or used in connection with such real property.

All of the property described above will be called the "Property". As used herein "State" shall refer to the state of California.

2. **Obligation Secured.** This Deed of Trust is given to secure performance of each promise of Trustor contained herein and in a _____ WaMu Equity Plus(TM) _____ Agreement and Disclosure with Beneficiary of even date herewith with a maximum credit limit of _____ $75,000.00 _____ (the "Credit Agreement"), including any extensions, renewals or modifications thereof, and repayment of all sums borrowed by Trustor under the Credit Agreement, with interest from the date of each advance until paid at the rates provided therein. The Credit Agreement provides for variable and fixed rates of interest. Under the Credit Agreement, the Trustor may borrow, repay and re-borrow from time to time, up to the maximum credit limit stated above, and all such advances shall be secured by the lien of this Deed of Trust. This Deed of Trust also secures payment of certain fees and charges payable by Trustor under the Credit Agreement, certain fees and costs of Beneficiary as provided in Section 9 of this Deed of Trust, and repayment of money advanced by Beneficiary to protect the Property or Beneficiary's interest in the Property, including advances made pursuant to Section 6 below. The Credit Agreement provides that unless sooner repaid, all amounts due under the Credit Agreement are due and payable in full thirty (30) years from the date of this Deed of Trust (the "Maturity Date"). All amounts due under the Credit Agreement and this Deed of Trust are called the "Debt".

3. **Representations of Trustor.** Trustor represents that:
    (a) Trustor is the owner of the Property, which is unencumbered except by: easements, reservations, and restrictions of record not inconsistent with the intended use of the Property and any existing first mortgage or deed of trust given in good faith and for value, the existence of which has been disclosed in writing to Beneficiary; and
    (b) The Property is not presently and will not during the term of this Deed of Trust be used for any agricultural purposes.

4. **Promises of Trustor.** Trustor promises:
    (a) To keep the Property in good repair and not to remove, alter or demolish any of the improvements on the Property, without first obtaining Beneficiary's written consent;
    (b) To allow representatives of Beneficiary to inspect the Property at any reasonable hour, and to comply with all laws, ordinances, regulations, covenants, conditions and restrictions affecting the Property;
    (c) To pay on time all lawful taxes and assessments on the Property;
    (d) To perform on time all terms, covenants and conditions of any prior mortgage or deed of trust covering the Property or any part of it and pay all amounts due and owing thereunder in a timely manner;
    (e) To see to it that this Deed of Trust remains a valid lien on the Property superior to all liens except those described in Section 3(a), and to keep the Property free of all encumbrances which may impair Beneficiary's security;
    (f) To keep the improvements on the Property insured by a company satisfactory to Beneficiary against fire and extended coverage perils, and against such other risks as Beneficiary may reasonably require, in an amount equal to the full insurable value of the improvements, and to deliver evidence of such insurance coverage to Beneficiary. Subject to the rights of the holder of any lien described in 3(a), Beneficiary shall be named as the loss payee on all such policies pursuant to a standard lender's loss payable clause. The amount collected under any insurance policy shall

4 3 6 0 (01/24/07) w8.2                                                                 Page 2 of 7

be applied to the repair of such improvements, unless doing so would impair Beneficiary's security, in which event such proceeds may be applied upon any indebtedness hereby secured. In the event of foreclosure or sale of the Property pursuant to the Trustee's power of sale, all rights of the Trustor in insurance policies then in force shall pass to the purchaser at the Sheriff's or Trustee's sale.

   (g)  To sign all financing statements and other documents that Beneficiary may request from  time to time to perfect, protect and continue Beneficiary's security interest in the Property. Trustor irrevocably appoints Beneficiary as Grantor's attorney-in-fact to execute, file and record any financing statements or similar documents in Trustor's name and to execute all documents necessary to transfer title if there is a default; and

   (h)  To advise Beneficiary immediately in writing of any change in Trustor's name, address or employment.

   5.  **Sale, Transfer or Further Encumbrance of Property.**  Subject to applicable law, the entire Debt shall become immediately due and payable in full upon sale or other transfer of the Property or any interest therein by Trustor by contract of sale or otherwise including, without limit, any further encumbrance of the Property.

   6.  **Curing of Defaults.**  If Trustor fails to comply with any of the covenants in Section 4, including all the terms of any prior mortgage or deed of trust, Beneficiary may take any action required to comply with any such covenants without waiving any other right or remedy it may have for Trustor's failure to comply. Repayment to Beneficiary of all the money spent by Beneficiary on behalf of Trustor shall be secured by this Deed of Trust; at Beneficiaries option, advance may be made against the Credit Agreement to pay amounts due hereunder; such shall not relieve Beneficiary from liability for failure to fulfill the covenants in Section 4. The amount spent shall bear interest at the rates from time to time applicable under the Credit Agreement and be repayable by Trustor on demand. Although Beneficiary may take action under this paragraph, Beneficiary is not obligated to do so.

   7.  **Remedies For Default.**
   (a)  Prompt performance under this Deed of Trust is essential. If Trustor does not pay any installment of the Debt or other amount due hereunder on time, or any other event occurs that entitles Beneficiary to declare the unpaid balance of the Debt due and payable in full under the Credit Agreement, or if Trustor fails to comply with any other term, condition, obligation or covenant contained in the Credit Agreement or this Deed of Trust or any rider thereto, or any other deed of trust, mortgage, trust indenture or security agreement or other instrument having priority over this Deed of Trust, or if any representation of Trustor herein was false or misleading, the Debt and any other money whose repayment is secured by this Deed of Trust shall immediately become due and payable in full, at the option of Beneficiary, and the total amount owed by Trustor shall thereafter bear interest at the rate(s) stated in the Credit Agreement. Beneficiary may then or thereafter advise Trustee of the default and of Beneficiary's election to have the Property sold pursuant to Trustee's power of sale in accordance with applicable law and deliver to Trustee any documentation as may be required by law. After giving any notices and the time required by applicable law, Trustee shall sell the Property, either in whole or in separate parcels or other part, and in such order as Trustee may choose, at public auction to the  highest bidder for cash in lawful money of the United States which will be payable at the time of sale all in accordance with applicable law. Anything in the preceding sentence to the contrary notwithstanding, Beneficiary may apply the Debt towards any bid at any such sale. Trustee may postpone any such sale by providing such notice as may be required by law. Unless prohibited by law, any person, including the Trustor, Beneficiary or Trustee, may purchase at any such sale. Trustee shall apply the

proceeds of the sale as follows:  (i) to the expenses of the sale, including a reasonable trustee's fee and lawyer's fee; (ii) to the obligations secured by this Deed of Trust; and, (iii) the surplus, if any, shall go to the person(s) legally entitled thereto.

(b)   Trustee shall deliver to the purchaser at the sale its deed, without warranty, which shall convey to the purchaser the interest in the Property which Trustor had or had the power to convey at the time of execution of this Deed of Trust and any interest which Trustor subsequently acquired. The Trustee's deed shall recite the facts showing that the sale was conducted in compliance with all the requirements of law and of this Deed of Trust. This recital shall be prima facie evidence of such compliance and conclusive evidence of such compliance in favor of bona fide purchasers and encumbrancers for value.

(c)   To the extent permitted by law the power of sale conferred by this Deed of Trust is not an exclusive remedy. In connection with any portion of the Property which is personal property, Beneficiary shall further be entitled to exercise the rights of a secured party under the Uniform Commercial Code as then in effect in the state of California.

(d)   By accepting payment of any sum secured by this Deed of Trust after its due date, Beneficiary does not waive its right to require prompt payment when due of all other sums so secured or to declare default for failure to so pay.

8.   **Condemnation; Eminent Domain.**  In the event any portion of the Property is taken or damaged in an eminent domain proceeding, the entire amount of the award, or such portion as may be necessary to fully satisfy the Debt, shall, except as required by applicable law, be paid to the Debt.

9.   **Fees and Costs.**  Trustor shall pay Beneficiary's and Trustee's reasonable cost of searching records, other reasonable expenses as allowed by law, and reasonable attorney's fees, in any lawsuit or other proceeding to foreclose this Deed of Trust; in any lawsuit or proceeding which Beneficiary or Trustee prosecutes or defends to protect the lien of this Deed of Trust; and, in any other action taken by Beneficiary to collect the Debt, including without limitation any disposition of the Property under the State Uniform Commercial Code; and, any action taken in bankruptcy proceedings as well as any appellate proceedings.

10. **Reconveyance.**  Trustee shall reconvey the Property to the person entitled thereto, on written request of Beneficiary, or following satisfaction of the obligations secured hereby and Beneficiary and Trustee shall be entitled to charge Trustor a reconveyance fee together with fees for the recordation of the reconveyance documents unless prohibited by law. If your Credit Line is cancelled or terminated, subject to applicable law, we may delay the cancellation or reconveyance of your security instrument for a reasonable period of time to enable us to post to your Credit Line Account any advances that you have received.

11. **Trustee; Successor Trustee.**  Beneficiary may, unless prohibited by law, appoint a successor Trustee from time to time in the manner provided by law. The successor Trustee shall be vested with all powers of the original trustee. The Trustee is not obligated to notify any party hereto of a pending sale under any other deed of trust or of any action or proceeding in which Trustor, Trustee or Beneficiary shall be a party unless such action or proceeding is brought by the Trustee.

12. **Savings Clause.**  If a law, which applies to this Deed of Trust or the Credit Agreement and which sets maximum loan charges, is finally interpreted by a court having jurisdiction so that the interest or other loan charges collected or to be collected in connection with this Deed of Trust or the Credit Agreement exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already

4 3 6 0 (01/24/07) w8.2                                          Page 4 of 7

collected from Trustor which exceeded permitted limits will be refunded to Trustor. Beneficiary may choose to make this refund by reducing the principal owed or by making a direct payment. If a refund reduces the principal, the reduction will be treated as a partial prepayment.

13. **Miscellaneous.** This Deed of Trust shall benefit and obligate the heirs, devisees, legatees, administrators, executors, successors, and assigns of the parties hereto. The term "Beneficiary" shall mean the holder and owner of the Credit Agreement secured by this Deed of Trust, whether or not that person is named as Beneficiary herein. The words used in this Deed of Trust referring to one (1) person shall be read to refer to more than one (1) person if two (2) or more have signed this Deed of Trust or become responsible for doing the things this Deed of Trust requires. This Deed of Trust shall be governed by and construed in accordance with Federal law and, to the extent Federal law doesn't apply, the laws of the state of California. If any provision of this Deed of Trust is determined to be invalid under law, the remaining provisions of this Deed of Trust shall nonetheless remain in full force and effect.

14. **Beneficiary and Similar Statements.** Beneficiary may collect a fee in the maximum amount allowed by law for furnishing any beneficiary statement, payoff demand statement or similar statement.

15. **Riders.** If one (1) or more riders are executed by Trustor and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument. [Check applicable box(es)]

☐ Condominium Rider                    ☐ Other: _____
                                                        (specify)
☐ Planned Unit Development Rider

By signing below Trustor accepts and agrees to the provisions of this Deed of Trust and of any rider(s) executed by Trustor concurrently therewith.

DATED at _Los Angeles,    CA_____ this _6th_ day of _December_ , _2007_.

TRUSTOR(S):

MARK A CIRILLO

STATE OF CALIFORNIA

COUNTY OF _Los Angeles_

On 12/06/07 before me, _Mayra Pineda_ , Notary Public,

(here insert name)

personally appeared
MARK A CIRILLO _____

_____
_____
_____
_____
_____
_____

~~personally known to me~~ (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.                                   (Seal or Stamp)

Signature: _Mayra Pineda_
My Commission expires: _July 18, 2010_
My Commission number: _1682059_

MAYRA PINEDA
Commission # 1682059
Notary Public - California
Los Angeles County
My Comm. Expires Jul 18, 2010

## REQUEST FOR FULL RECONVEYANCE
Do not record. To be used only when Trustor's
indebtedness has been repaid and Credit Agreement cancelled.

TO: TRUSTEE _____

The undersigned is Trustee of the within Deed of Trust, and the legal owner and holder of the ___ WaMu Equity Plus(TM) ___ Agreement secured thereby. Said Deed of Trust is hereby surrendered to you for reconveyance and you are requested, upon payment of all sums owing to you, to reconvey, without warranty, to the person(s) entitled thereto, the right, title and interest now held by you thereunder.

DATE: _____

WASHINGTON MUTUAL BANK _____

By _____

Its _____

4 3 6 0 (01/24/07) w8.2                                    Page 7 of 7

# EXHIBIT "A"
## ATTACHMENT TO SECURITY INSTRUMENT

LT: 14 SD: 4831 BK: 54 PG: 90, COUNTY OF LOS ANGELES, CA



## Government Code 27361.7

Under the provisions of Government Code 27361.7, I certify under the penalty of
perjury that the following is a true copy of illegible wording found in the attached
document:

- *Los Angeles*
- *Company*
- *Chatsworth*
- *("Trustee")*
- *Association*
- *States*
- *Henderson*
- *grants, bargains*
- *gets*
- *Los Angeles*
- *5057-006-005*
- *to it, all*
- *fencing*

**Place of Execution : Norwalk**

SPL, Inc. as agent

G. MONTEZ

DEC 2 0 2007

Date: _____/_____/_____

Revised 9/6/06 R.1
DR 012 Penalty of Perjury R1[1].doc

**EXHIBIT C**

**This page is part of your document - DO NOT DISCARD**





## 20230590448

**Pages:
0002**

**Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California**

**09/05/23 AT 12:11PM**

| | |
|---|---|
| FEES: | 22.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| SB2: | 75.00 |
| PAID: | 97.00 |



**L E A D S H E E T**





**SEQ:
01**

**SECURE - Daily**



**THIS FORM IS NOT TO BE DUPLICATED**



*E441968*


E13-20230905980050

[RECORDING REQUESTED BY]
NATIONWIDE TITLE CLEARING, LLC

[AND WHEN RECORDED MAIL TO]
JPMorgan Chase Bank, NA
C/O Nationwide Title Clearing, LLC
2100 Alt. 19 North
Palm Harbor, FL 34683

Loan #: ████████

## CORPORATE ASSIGNMENT OF DEED OF TRUST

Contact JPMORGAN CHASE BANK, N.A. for this instrument 780 Kansas Lane, Suite A, Monroe, LA 71203, telephone # (866) 756-8747, which is responsible for receiving payments.

FOR GOOD AND VALUABLE CONSIDERATION, the sufficiency of which is hereby acknowledged, the undersigned, JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, SUCCESSOR IN INTEREST BY PURCHASE FROM THE FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER OF WASHINGTON MUTUAL BANK F/K/A WASHINGTON MUTUAL BANK, WHOSE ADDRESS IS 700 KANSAS LANE, MC 8000, MONROE, LA 71203, (ASSIGNOR) by these presents does convey, grant, assign, transfer and set over the described Deed of Trust, representation or warranty, together with all rights, title and interest secured thereby, all liens, and any rights due or to become due thereon to JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, WHOSE ADDRESS IS 700 KANSAS LANE, MC 8000, MONROE, LA 71203 (866)756-8747, ITS SUCCESSORS AND ASSIGNS, (ASSIGNEE).

Said Deed of Trust made by MARK A CIRILLO to WASHINGTON MUTUAL BANK, A FEDERAL ASSOCIATION and recorded on 12/20/2007 as Book n/a, Page n/a and Instrument # 20072798692 in the office of the LOS ANGELES County Recorder, CA.

Property is commonly known as: 2640 VINEYARD AVE, LOS ANGELES, CA 90016-2928.

Dated on 08 / 25 / 2023 (MM/DD/YYYY)
JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, SUCCESSOR IN INTEREST BY PURCHASE FROM THE FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER OF WASHINGTON MUTUAL BANK F/K/A WASHINGTON MUTUAL BANK

By: _____
      David Lawson
      Assistant Secretary

STATE OF LOUISIANA
PARISH OF OUACHITA
On 08 / 25 / 2023 (MM/DD/YYYY), before me appeared David Lawson _____, to me personally known, who did say that he/she/they is/are the Assistant Secretary _____ of JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, SUCCESSOR IN INTEREST BY PURCHASE FROM THE FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER OF WASHINGTON MUTUAL BANK F/K/A WASHINGTON MUTUAL BANK and that the instrument was signed on behalf of the corporation (or association), by authority from its board of directors, and that he/she/they acknowledged the instrument to be the free act and deed of the corporation (or association).

_____
Yolanda A. Diaz   87401
Notary Public - STATE OF LOUISIANA
Commission expires: Upon My Death
JPCAS ████████ CHASE  T182308-11:18:23 [C-1] FRMCAL1

Yolanda A. Diaz
State of Louisiana
Lifetime Commission
Notary Public ID # 87401

# EXHIBIT D

| START DATE: | 4/11/2024 | |
|---|---|---|
| END DATE: | 4/11/2025 | |

**Collect PMT  Due**

| Date of last payment received: | | | Date Pmt Applied to: | |
|---|---|---|---|---|
| **Payments Due** | | | | |
| **From** | **To** | **#** | **P&I** | **Total** |
| 4/11/2024 | 4/11/2024 | 1 | $504.99 | $504.99 |
| 5/11/2024 | 5/11/2024 | 1 | $539.63 | $539.63 |
| 6/11/2024 | 7/11/2024 | 2 | $522.03 | $1,044.06 |
| 8/11/2024 | 10/11/2024 | 3 | $539.43 | $1,618.29 |
| 11/11/2024 | 11/11/2024 | 1 | $496.21 | $496.21 |
| 12/11/2024 | 12/11/2024 | 1 | $507.41 | $507.41 |
| 1/11/2025 | 1/11/2025 | 1 | $479.00 | $479.00 |
| 2/11/2025 | 2/11/2025 | 1 | $482.27 | $482.27 |
| 3/11/2025 | 3/11/2025 | 1 | $465.94 | $465.94 |
| 4/11/2025 | 4/11/2025 | 1 | $434.87 | $434.87 |
| | | | | |
| **Number of Pmts in Arrears:** | | **13** | **Total Amt in Arrears:** | **$6,572.67** |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: **2173 SALK AVE., SUITE 250, CARLSBAD, CA 92008.**

A true and correct copy of the foregoing document entitled (*specify*): **JPMORGAN CHASE BANK, NATIONAL ASSOCIATION'S OBJECTION TO CONFIRMATION OF PLAN**

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **June 19, 2025**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Nancy K Curry (TR)    TrusteeECFMail@gmail.com**
- **Benjamin Heston    bhestonecf@gmail.com, benheston@recap.email,NexusBankruptcy@jubileebk.net**
- **United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov**

**2. SERVED BY UNITED STATES MAIL**:
On **June 19, 2025**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

***Debtor***
Mark Anthony Cirillo
2640 Vineyard Ave
Los Angeles, CA 90016                              ☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

                                                      ☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| June 19, 2025 | Kim Duke | /s/ Kim Duke |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.